Good morning, and may it please the Court. Joshua Chadwick for the Federal Reserve Board. I'd like to reserve three minutes for rebuttal. This case is about two things. First, identifying Congress' mandate to the Board regarding debit interchange fees, and second, discerning the bounds Congress set for the Board in implementing that mandate. To answer those questions, this Court must determine the best reading of the statute. In each case, the Board's reading is the best reading. That is true both as to Congress' core instruction to the Board and to the specific considerations Congress provided to help guide the Board's discretion. Plaintiff's reading is not the best reading, which is why it has spilled so much ink explaining away the statute's grammar, explaining away its punctuation, explaining away the surplusage inherent in its reading, and explaining away Congress' direction to ensure that interchange fees are reasonable and proportional to issuers' transaction-related costs. In plaintiff's telling, basic principles of statutory interpretation and canons of statutory construction can be dispensed with in this case because they aren't absolutes and, after all, Congress wanted to lower interchange fees. In adopting plaintiff's arguments, the District Court chalked up inconvenient portions of the statutory text to congressional blunders. Whatever blunders congressional drafters may or may not have made, what matters here is the statutory text as it is written. And in slashing the unregulated rate fully by half, there can be no question that the Board fully implemented Congress' purpose. It's of course true that merchants stand to gain from more aggressive market intervention and regulation from the Board. That's definitely true. But that's not what this statute calls for and not what this Court should command. You just talked about the plain text. And one thing that I think is not covered very well in the briefing is what is, to the Federal Reserve, what does incremental cost mean to you? Well, the Board elected, after going out for comment, Your Honor, not to define incremental cost. The Board considered various conceptions of that that were provided in the comments. There's no single economic meaning that would apply in this circumstance. So the Board asked about marginal cost. There were zero comments received on that. The Board asked about average variable cost, which it considered an initial proposal but determined after reviewing the comments was not helpful or manageable in practice. And so, you know, to ultimately resolve what were quite intractable problems in the Board's view, the Board took Congress' overarching command, applied that alongside the demand from Congress that incremental ACS costs be considered and that costs that are not specific to particular transactions be excluded, and determined that all the ACS costs, which were costs that are incurred by issuers when they're effecting transactions, were permitted by the statute. See, I'm very skeptical, because when you look at the structure of the statute, it mentions incremental cost in little i, then talks about particularity in little 2, and then later on it says shall be reasonable and proportional to the costs incurred by the issuer with respect to the transaction. The way I read that is all three of those provisions are talking about marginal cost. And the problem I'm having is figuring out how marginal cost can be taken into account by a flat fee, which seemed to be divorced from marginal cost. And so if we're talking about marginal cost, how has the Federal Reserve rule achieved that? Well, I guess I would push back a little bit, Your Honor, in the sense that I don't think the Board thought that marginal cost was the right answer. In fact, zero, and there's a notation that's in effect in the preamble to the rule, there were zero comments that were received advocating for marginal cost. The additional cost of one additional transaction, once the issuers have their debit processing systems up and running, is fleeting. It's very, very low, and it's true that Congress was not intending that the issuers were to offer this as a free service. Right? So the issuers have a lot of costs invested in providing these debit interchange services. Wasn't that the point, though, was to lower costs? I mean, I get it, it's fleeting, but there are costs, fraud losses, right? So if you have a $20 transaction that's lost, that's $20. You may be able to spread it out over multiple, multiple transactions to get the marginal cost, but the whole point was to lower costs. Absolutely, Your Honor. And the Board didn't just lower it. It slashed it by more than half, with real implications. I mean, just to give you one sort of quick anecdote, my colleagues and I went out to dinner last night here in St. Paul, very nice dinner, when the check came, the — there was a 4 percent surcharge, and that was for use of credit cards. And there's a notation right on the receipt that says, if you pay cash or use your debit card, we're going to take this right off, meaning that there's a very real difference for that merchant in having its customers pay by debit cards, because those fees had been hacked way, way down from what they were. They were 44 cents. But the way I read this, and I just want to — I want to finish. When you read the whole statute, which is why I'm having trouble with what the Federal Reserve is doing, I think what it's getting at is there's certain fixed costs. You can't really spread those costs among the issuers. It's the cost of each transaction that the consumers have to pay for. Now, that might be a dumb way to run a railroad, but that's how I read what this is getting at. Well, let me — let me give you an example that I think will help — hopefully help understand the problem that the Board faced. Right? So when issuers process these transactions, they can do things in-house. They get economies of scale. They can buy their own computer servers, have their own staff. And those are sort of fixed costs, right? You know, at least initially they're fixed, right? You get these computer servers. They process the number of transactions for a certain period of time. Another thing they can do is take these same services and outsource them to some third party. Now, a third party will charge a flat fee now per transaction. Now this third-party service provider has, you know, by that arrangement converted all of that issuer's fixed, quote-unquote, fixed costs into variable costs because they — it changes based on the number of transactions processed in the year. And let me give you another example — And that's okay, though. Why is that not okay? I mean, then incorporate that in the interchange fee. Well, that would drive the costs up, which was contrary to what Congress wanted, which is to drive the costs down. I think the Board took a lot of consideration in wanting issuers to lower their costs and to process these transactions efficiently and not — But as you said, we're — you know, the actual cost — I think you've admitted this — the actual marginal cost is negligible. So it still would probably — maybe I'm wrong about this — would still probably be below the flat fee that the Fed is charging. Or the Fed's allowing — excuse me, the Fed's allowing. Right. It's true that marginal cost is fleeting. But again, even my friend on the other side, his clients — and by his clients, I mean the broader merchant industry — nobody suggested that that should be the right answer. No one was suggesting marginal cost. And when this case was argued for the D.C. Circuit the first time, Judge Williams really zeroed in on this question and said, it must be the case that Congress anticipated that issuers would recover sort of the fundamental cost that they need to process transactions. Like, it has to be — you could have defined incremental in different ways, like long-run incremental costs that would take into account, you know, the cost that it takes to process these transactions. Let me give you just one specific example. Imagine this computer server can process one million transactions, okay? So the first couple of years, this issuer is using their server processing 800,000, 900,000 transactions. Then in the third — that's a fixed cost. Then in the third year, they get to one million and one transactions. They need a second server, okay? So what — in that year, now the cost of the servers is a variable cost. And arguably, the marginal cost of that one million and first transaction is the whole cost of the server. But that's not the way this works, and no one would expect that you could charge that, you know, particular transaction to that server. So now you end up in a circumstance where, in differing years, the same costs are either, you know, fixed or variable. So the Board found that that neither marginal nor fixed nor variable cost were a very effective way of solving the problem that Congress was asking the Board to solve. And on the issue of the mandate, the overall mandate, let me just go back to that, because it is true that Congress gave specific instructions and the Board followed those instructions, but the overall mandate is for the Board to ensure that a transaction fee received by an issuer is reasonable and proportional to the cost incurred by the issuer with respect to the transaction. So what's to be assessed through the Board's regulation is just that, the reasonableness and proportionality of an interchange fee to the issuer's transaction-related costs. Counsel, as you know, one thing that you're supposed to distinguish between, the first thing is incremental cost. Right. How can something that you write in your regulation called a fixed cost be an incremental cost? But a long-run incremental, I mean, these are, this is, there's no, and the Board identified this in the rulemaking, Your Honor. There's multiple conceivable definitions. Oh, in the long run, we all die, says John Maynard Keynes. Right. No, I understand that point, but it's got to be somewhat incremental, doesn't it? Right. But so let me just jump back on fixed and variable. Of course, those are not actually terms that are used in the statute. No, I know they're not in the statute, but they're sure in, they're sure in your regulation. Well, the Board considered them, for sure, Your Honor. Considered what's considered a fixed cost, but again, what's considered a fixed cost in one conception is a variable cost in another. If you have to buy the server yourself and you use it, that's a fixed cost. If you outsource that. That sounds like a blank check, and Congress didn't mean to write you a blank check. Well, particularly in the regulation, it goes into great detail on transactions processing, is what you call it. And you talk about how it's essential fixed stuff. You know, hardware, equipment, software, labor. And then you say they are, quote, specific to the, they are specific to a particular transaction. You know where I'm quoting from. Right. Boy, that just seems to be defining words that don't fit together. Well, you know, I think the Board read that to mean incurred in the course of affecting debit card transactions, because no transactions could occur without incurring those costs, Your Honor. And again, I think it has to be the case that Congress anticipated that issuers were going to recover some number of costs, right? And so putting these issues, these questions into buckets is what Congress asked the Board to do. Fundamentally, a line drawing exercise. And I don't think that it was a, that there was a blank check. The Board excluded lots and lots of costs and brought the fees way, way down. And those, yes, some of those decisions involved judgment calls. I'll give you one example. The cost of producing a debit card, right? So the Board excluded that in part because the cost of a debit card is something that a bank will likely, an issuing bank will likely incur because they want their customers to go to use an ATM, right? So even though you need that card to affect the transaction, the Board scoped that out. And in doing that, it considered the fact that in the checking context, which is another factor the Board was asked to consider, that a bank customer or depositor or the bank takes on the cost of those checks. Same thing with, like, cardholder inquiries. So, yes, the Board had to make some judgment calls in what was in and out. But it excluded a whole lot of costs and incurred, and allowed only the recovery of those that were related to affecting debit card transactions. You know, I have a question on the, sort of related to what Judge Benton was saying, which is the transaction processing fees. Are those done per transaction, like by a third party? We talked about third parties earlier. Are those just a computer program that runs and looks at all the transactions? So therefore, they're kind of like fixed costs. Is it the transactions monitoring costs? Or monitoring fees. I'm sorry. I used the wrong phrase. Monitoring fee. That's a good question. You know, I think they can be structured differently. But I think the most important insight that the Board had on this issue is that they are part of the authorization, clearing, and settlement cost, right? So Congress directed the Board to consider incremental authorization and clearing and settlement costs. We've talked about the incremental issue already. But these costs that are part and parcel of that authorization, clearing, and settlement, the Board viewed those as properly recoverable under the statutory text and Congress' direction. But whether or not, in a particular case, that was by transaction or whether it's a flat fee for a third party service provider may depend on the particular issuer. Well, I ask that because usually there's not a human involved. When you get a pop-up that says, oh, there's a fraud alert, that's usually done by a computer, I think. And then you call and talk to a customer service rep. So I'm just curious. It sounds to me like you don't know the answer or it could be either or. Well, I think what the Board called them was there's neural networks. They're like algorithms that are done automatically. It's sort of like it is a computer in the background, but it's a service that the issuer has to pay for and conduct itself or require a third party to do. But I will say these sorts of things like, you know, where the bank follows up on a potentially fraudulent transaction, the Board did not include those specific costs. Those were separately scoped out. Counsel, if the banks aren't able to continue to use the methodology they've used, where will those costs be paid for from? Where will it come from to compensate or will they just take a loss? Well, that's an economically complicated situation, Your Honor. The question of where these costs ultimately get allocated either way is the subject of some dispute. I think what the banks would say is that they're able to offer free checking and other banking products. And if they weren't able to recover their costs, then they wouldn't be able to do that. They'd have to make up that revenue from some other source. Does that answer your question? I'm trying to figure out what those other sources would be that wouldn't have a deleterious effect on the consumer. Well, obviously the banks have varying lines of business for the most part, Your Honor. So they would have to supplement. If they're not able to recover their costs, then they have to supplement that through other business lines. And I will say just one point on this. Where the Board set the cap does not allow all the banks to recover their costs, right? The Board had to set a line. But where it set that based on the data was at the 80th percentile, meaning that 20 percent of the banks are taking a loss on this. And so, you know, it's not the case that every institution is recovering all of its costs under the cap. Are there differences, do you know, are there differences in fees based on geography, size of bank, size of transaction, or are they all sort of the same? I mean, is it very similar, the cost, no matter any of these variables? So my understanding, and the Board surveys the data from various issues, and that the costs are in different places, right? So 80 percent of them are underneath the cap. But what the actual interchange fee that's received at a particular institution, it varies depending on the state. Well, and I'm wondering, so for example, the thing I thought of, and I don't know if this is true or not, but transactions are crossed great distances, right? So you've got a zip code in Washington where the debit card is from, but you have a Florida transaction. And I wonder if that's more expensive than if I walked out to the corner store here being an MSP resident and ran my debit card. I don't know the answer to that. But that would suggest that a flat fee doesn't work if, in fact, there are differences along these lines between those types of transactions. I don't want to get beyond my own ken, Your Honor, but I don't think there's a difference there, but I'm not 100 percent certain about that. There's a lot of issues in this case. I do want to be cognizant of my time for a bottle, but I'll reserve. Thank you. Good morning, Your Honor. May it please the Court, Tyler Green on behalf of the Appalachian Corner Post. We agree with the Board about the importance or about the specific questions that need to be answered here. What is the scope of Congress's mandate, and what are the bounds of that mandate? But it probably will be no surprise to this panel to know that we disagree with the Board's answers to those questions. If I could take them in order, and I think the way we've been thinking about this case and the way that we would ask the Court to think about it is to follow the Supreme Court's instructions from the Loper-Bright case and to look at the entire statute in context. So it's a little bit of a forest for the trees question, and let me kind of explain how that informs our view of what the right answer is here. So starting from the top of the statute, Section A-2 is where Congress identified the standard that the Board was supposed to adopt. It was supposed to adopt a fee that was reasonable and proportional to the cost incurred by the issuer with respect to the transaction. Then in Section A-3, Congress gave the Board rulemaking authority to establish that standard and also gave the Board authority to gather and collect whatever information it might need from the regulated community, from the banks, to be able to execute on that particular instruction. Then in Section A-4, we've got the considerations, and there were three of them that Congress... And consultations. And consultations, correct. So actually, that's an important distinction, Judge, because the title of the section is, in fact, considerations and consultations. So at the very beginning, number one... And Congress enacted that title, right? Correct. You're sure Congress enacted the title? That's my understanding, Judge, yes. Okay. So as part of that, first is to consider the functional similarity between checks and debit cards. Second is to distinguish between the incremental cost incurred by an issuer for the issuer's role in authorization, clearance, or settlement, which costs shall be considered under Paragraph 2. So it's a link back to the initial instruction to make it reasonable and proportional. And then other costs, little B-2, other costs incurred by an issuer, which are not specific to a particular electronic debit transaction, which costs shall not be considered. And then Part C under 4 is some consultation requirements. Then Section A-5 is instructions from Congress to the Board to, or authorization, I should say, from the Board, to consider whether an adjustment is appropriate for fraud prevention costs. So is it your interpretation of 4B-I, that only incremental costs are to be compensated? It's our understanding that that is supposed to be the basis for the reasonable and proportional fee. So that's what's to be included, but I think this is an important and critical point, Your Honor. But what are other costs? Other costs are to be excluded. So the answer to your question is, yes, the basis for it is supposed to be the incremental costs of authorization, clearance, and settlement of ACS. But it's not a straight jacket. Congress did not say, and I heard my friend from the Board say a couple of times, Congress, of course, I think, recognized and acknowledged that the Board would be able to allow the banks to recover costs here. Congress is not asking the banks to take a loss. Let me be perfectly clear about that. So in the course of setting that fee, the Board is supposed to identify those incremental costs and then use its discretionary authority under Section A-2 and A-3 to identify a fee that is reasonable and proportional to those incremental costs. Would it be a flat fee, or would it be a fee based on the actual cost for a particular transaction? So if I go to a corner store, that's the cost. If somebody else goes to another city, that's the cost. Yeah. So I think this is how we're thinking about it. I have a couple of responses to that. So this is where when Judge Treanor's holding, talking about an issuer-specific and a transaction-specific fee, I think that Judge Treanor was correct about that. And in the course of figuring out what that is, I think it gets back to this Court's opinion. One place that I would look for is the Court's opinion in the 3M case, where you've got an indefinite article followed by a definite article. The instructions from Congress in Section 2 and Section 3 talk about an issuer and an interchange fee, and then the issuer and the interchange fee. So throughout the structure and text of the statute, it continually links back to whatever the particular issuer is doing. So as long as it links back to the issuer and is specific to that set of transaction costs, then it's permissible under the cap. So we're at a little bit of a disadvantage, Judge Strass, because we don't have all of the data. I think the Board has the ability to gather it and certainly has been gathering it for the last decade. So we could foresee a situation where, as they've done with, as the Board has done here with sort of the fraud costs, the fraud loss costs, they've made it sort of very specific to the transaction by making it an ad valorem piece. It's conceivable, at least theoretically, that the Board could do something like that here with respect to the initial cost consideration itself. Well, the way I was thinking about it, and I, you know, I spent some time looking at the statutory scheme. I was wondering, I was left wondering, whether or not they could set up a schedule of charges, interchange fees, based on the size of the transaction or the geography or whatever affects cost. In your view, is that permissible, even if we don't take a transaction-by-transaction-by-transaction view of costs? So here's how I want to answer that. I would go back to the text of the statute, and as I understand and as we read the statute, the statute requires it to be specific to an issuer and specific to a transaction. There, I think, is room for the Board to make some simplifying assumptions. Those would have to be based on and derived from whatever data the Board is gathering from the banks in response to its survey. So in a world where if the data were to show that there could be some sort of tiers or some sort of categories, for example, certain banks were more efficient. Remember, the purpose here was to make banks more efficient and to make them compete. So to the extent that it's done its job, the regulation the statute has, and banks were able to do that, then if the Board were able to look to that data and justify its final outcome by saying, for these types of banks and these types of transactions, here's what we see is sufficient for them to, a fee that is sufficient for them to recover all their costs and be reasonable and proportional to it, then yes, my answer is theoretically and conceivably we could have something that's tiered or something that's done by categories. Well, this regulation has been in existence for 15 years, right? Something very close to that.  So how have they been doing it? A schedule or how has the Board been doing it these 15 years? I know it's under the D.C. Circuit's opinion, but how has it been doing it in response to that? Yeah, so since the beginning, since the final rule was adopted, it's been 21 cents plus a five basis point ad valorem component. So it has been a flat fee. A fee for everybody. Correct. No matter what the banks or the issuers' respective transaction costs are. And that's the fundamental problem under the statute. Do your clients think a flat fee is okay? Again, I think it would depend on the data, on the Board's justification. You have 15 years. You've got as good a data as they do. But we don't, actually. You've got your own data from your own bank, surely. My clients are merchants who have their own. Well, all merchants have data. I think you're dodging that question. Well, I'm sorry, Judge, I don't. No, is a flat fee good with your people or not? Again, it depends on how the Board wants to justify it based on the data that comes back from the bank. I think in certain circumstances, if you're talking an average, let me make sure I understand. Yeah. If the question is an average, of an average across the country for all issuers, then I think the answer to that question is no, for the reason that Judge Treanor explained. It has to be issuer-specific and it has to be transaction-specific. So if it were a flat fee. How many issuers are there? So it's covered issuers is the answer. Yeah, sure, I know. I get it. How many are there? I've forgotten the exact number, Your Honor. It's in the Board's published report. I think it's, Mr. Chadwick, I'm sure, can correct me. I think it's somewhere. It's in the hundreds, but I don't remember exactly where.  Yeah. And you say each of those should have a different fee? I'm saying yes. But with, again, the caveat in response to Judge Frost's question, that if the data show that a number of them are sufficiently similarly situated, that their costs are such for each issuer and for transaction to be lumped within some group or some category, then yes, I could see a world where that would be fine. Okay, is that a third category, counsel? You know, the district court phrases this as a two category and there's a third category in the middle we can't ever enter. I don't think so, Judge, because I think the district court's opinion was talking about the types of costs to be considered. We're talking about the fee itself. So my response to the court's question is the costs determine the fee? Is that what this is all about? They do. They do, in fact. And so that's why, but it's not, but again, the cost, what we're looking at is just that one particular type of cost, the incremental ACS cost. And if the output of that analysis is a situation where across a number of different issuers, again, if the data show that the issuers are sufficiently similar to fall within various categories, then yes. But that's a difference in the output versus a difference in the input. And what the dispute here is over is what is the input? The input that determines the output. Correct, that's right. And that's where we go back again. And to the structure of the statute and the plain text of the statute, there is not under Section 4, there is no permissive catch-all category, in the same way that Section 5 includes a permissive catch-all category, and in the same way that Section 3B includes a permissive catch-all category. The language, I think, from 3B and 5 is about as instructive as you're going to find in the statute. Section 3B, Congress gave the Board authority to publish the report as the, quote, as the Board considers appropriate and in the public interest. A sort of very broad grant of discretion to the Board to do what it considered to be appropriate. And then over in Section 5, with respect to the fraud adjustment, Congress gave the Board authority to consider, quote, such other factors as the Board considers appropriate. So I don't think there's any question. Section 2, if you're going to say it's in the others, is it that also in Section A2? No, it's not. It's not in reasonable proportional to? No. So you're saying the Board will do something that isn't in the public interest and is reasonable. I got it backwards. They've got a broad mandate to appropriate in the public interest, but they don't have a broad mandate on reasonable proportional, right? The mandate, Section 4, narrows the Board's authority on Section 2. That's what I'm saying. In the same way Judge Treanor mentioned, the statute is equivalent to a funnel. So it starts broad with a reasonable and proportional mandate and instruction, and then Congress specifically told the Board in Section 4 how to exercise it, how to determine what was reasonable and proportional. Because, again, it has to be reasonable and proportional to something, right? And those were the costs, and then the specific costs identified in subsection 4B. What do you view, I ask this of opposing counsel, I actually think this case probably hinges, at least in part, on the meaning of incremental costs. What does incremental costs mean to you or your clients? So this is, I think you're exactly right, Judge Strauss. We agree with you. It hinges on that completely. And incremental costs, this is how we read Section 4. And so Section 4, I think you have to read them in context together, Section 4B1 and 4B2. Incremental costs incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction. So I think what Congress said was, look, we understand for any debit transaction, there's a universe of costs, right? There's a broad universe of costs. Some of those are specific to a transaction, and some of them are not. And within that universe that is specific to a transaction, there's even a small universe, some of which is an incremental cost incurred by an issuer with respect to that particular ACS cost, right? So Congress, and the reason, and our answer to the Board's question about, like, hey, or the Board's suggestion that there's some superfluity problem here because of our reading of Section 4B, I think the answer is no, there's not. What Section 4B1 and 4B2 recognize is Congress's instruction to the Board, there's a broad universe of costs. You, Board, have direction from us to consider the incremental cost of the authorization, clearance, and settlement of a particular electronic debit transaction. That shall be considered. Other costs, including costs that are not specific, so the broader, there's specific to a transaction cost and not specific. The only cost that Congress allowed the Board to consider was this incremental cost. Everything else is off the table. And what is that? Is that marginal cost? Is that average variable cost? You heard the Federal Reserve saying, we asked about those, and nobody gave us an answer. Yeah. So I don't want to get, this is another part where I don't want to get too far out over my skis, right? And the answer, I think, is, this is actually the Board's, this is where the Board has to do its job. And part of what I'm still a little bit unsettled by being here today is that, to Judge Benton's point, we're now 15 years into this regulatory regime, and we don't have an answer from the Board about what incremental costs are. And it's the Board's job under the statute to take that statute of returns. That's not a fair characterization of their regulation, is it, where they identify the four that they're going to add to it, the four categories they're going to add to it? It's not a cost incurred in setting the standard? I don't think that's fair. Go ahead. Okay. I'm sorry to have interrupted, Judge. No, you didn't. Go ahead. So what they have done is they have not, if I understand Judge Strauss' question correctly, what they have not done is identify incremental costs. What they have done is say, we are going to identify all costs. We're going to base our rule based on all costs that are specific to a particular electronic debit transaction. That necessarily must include incremental costs, and that allows us to not have to identify with any sort of particularity or define what that incremental cost is because it's necessarily subsumed within this broader set of costs that are specific to a transaction. I think that's how I understand the Board's regulation. Does it include fixed costs? So you heard opposing counsel say, well, I have to now buy another server because instead of a million transactions, I have a million and one transactions. Right. Is that included as an incremental cost, the new server? So I think, so I would come back to the answer of there's no definition yet of what incremental means, and I think it's incumbent on the Board in the first place to discharge its authority under the statute to give some content to what that term means. You don't think it's our authority to or our responsibility to go ahead and say what we think incremental cost means as a matter of law? So I think you can, but if you're asking me, like, what the, like, for our position, right, the error in the Board's approach so far has been to say we haven't identified, it's in a footnote in its brief, Your Honor, right? I mean, I'm not, this is not something I'm making up. They said we haven't identified what incremental means. At a minimum, there is a distinction between incremental and fixed, and so I think just by, as a matter of law and a matter of logic, they haven't done their job under the statute because they haven't given any content to what that particular term means. So, but. Well, they do give, I just read it on this page, they do give a long-winded explanation for why fixed can be and fixed can't be. You know what I'm referring to, I bet, in the regulation. Sure. So, again, I don't think that's quite fair to the Board. They did discuss the issue for a page. They did discuss the issue, but the legal answer was to avoid giving any content to the specific thing that Congress told them, again, in B-4, you shall distinguish between this particular cost, this incremental cost, and other costs. That mandate remains unfulfilled 15 years later because they couldn't figure out what incremental cost meant. Now, here's where I'm willing to grant you, to your point, Judge Strauss, if they had offered something, it would probably be a different set of circumstances under which we're here today. Maybe we're shooting different arrows at the target of, like, maybe their version or their definition of incremental cost was off for some particular reason, maybe as a matter of law, but they haven't even done that, so we're not even at that point of being able to shoot arrows at that particular target. Their conclusion is that it doesn't matter because they're going to look at all costs and come up with something that's reasonable and proportionate. Correct. That's their very words. Yes, it is. That's right. And that's also their very legal error because that's the fundamental interpretation or constructive dispute going on here about what Section 4B means. It was the maneuver to say, we don't have to do that because we can loop in this other set of permissive but unnamed costs, all costs specific to a particular transaction, and we'll just lump it under that umbrella. Well, why wouldn't Congress have written the amendment to simply say only incremental costs are to be considered, period? There's not an other cost consideration because the only cost that's recoverable is incremental. So I think my best answer to you, Judge Smith, comes from Senator Durbin's brief, and so the best answer there is it was Congress's way of forcing competition on the industry. This was a broken market from the beginning. This is a market where costs are set by parties who have no role in negotiating what those costs are. So as Congress surveyed the landscape and saw that fees were continuing to do this and sawing the significant harm it was having on merchants and on consumers because all those costs were ultimately being passed back to the consumer, Congress decided it was time to step in and fix it. And the way it decided to step in and fix it was to say, this is the particular set of costs we're going to allow the Board to consider when it's setting this fee. So it's really a mechanism for Congress to try to fix this market. Now, to Judge Strass' earlier point, he said maybe that's no way to run a railroad. I mean, that may well be the case, but it is, in fact, the case that this is the railroad Congress has picked. So this is what we're fighting over. If there are no further questions, we would ask the Court to affirm Judge Treanor's judgment. Thank you. Thank you, Mr. Gray. Just briefly, I'd like to pick up on a couple of the points that Judge Benton was making. First, on the data, the Board publishes the data so it's available to the merchants, it's available to Congress, so they know what the costs are. I also want to emphasize a point that my friend just made, and he made this concession to the District Court, and the District Court picked up on it at page 42 of its opinion, which is that he says it's okay, in his words, for the Board to have some room to make simplifying instructions, and then he says the Board can tier and categorize. Well, once we're in this land, this is line drawing. We've moved past the transaction and the issuer, and we've moved into what Congress entrusted to the Board, which was making a reasonable and proportional standard for assessing interchange transaction fees. And this is particularly significant because the Board found during the course of the rulemaking, this was consistent with comments that it received, that you can never know the isolated cost of one single transaction. So no matter what, the Board is going to be aggregating transactions and using a representative transaction, and that sort of aggregation was both necessary and is totally consistent for all the reasons that the Board explained in its brief with the statutory text. So once he said you can tier and categorize, well, that's what Congress entrusted the Board to do, and just because they would have categorized it or tiered it or drawn different lines, or even if the District Court would have done that, that's not what Congress's expectation was. And just briefly to Judge Strasse's point about incremental, right, the statute doesn't say reasonable and proportional to incremental cost. It says reasonable and proportional to the cost incurred by the issuer with respect to the transaction. And my friend, I mean, I think he wants to target a few that I understand, but the Board had a problem to solve, and as we're standing here today, he has no definition of incremental cost, right? The merchants have no definition of incremental cost. The Board discussed this at length in the rulemaking. It could define it a bunch of different ways, but that would just lead to additional challenge to that definition. And since there's no economic clearly agreed upon definition for the Board to apply here, it was totally reasonable for the Board to interpret the statute just the way it did, which is that it included all those incremental ACS costs. And as to the, you know, the third bucket of costs, I think the textual interpretation of the statute that the Board has is the best one. It's not just other costs. That's a restrictive language that comes after the word other costs. And under plaintiff's reading, that totally ignores the grammar, totally ignores the punctuation, totally ignores what Congress put on the page. So with that, I'll end where I began and ask that the judgment in district court be reversed. Thank you. Thank you, Mr. Chadwick. Thank you also, Mr. Green and all counsel who have prepared the court with information for this case. We will continue to study the record and the pleadings and render decisions in due course. Thank you.